**Opinion issued June 25, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-23-00249-CR**

————————————

**COLBIN JOHN WRIGHT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 77th District Court**
**Limestone County, Texas**
**Trial Court Case No. 15490-A**

---

## CONCURRING OPINION

### Introduction

After the jury found Colbin John Wright guilty of the third-degree felony offense of evading arrest in a motor vehicle and the state jail felony offense of theft, it assessed his punishment at 99 years of imprisonment. In the usual case, the more

serious of the two crimes, the third-degree felony, is punishable by 10 years in prison at most. However, this is not the usual case.

Here, the prosecution alleged that Wright had previously been convicted of two other felonies: aggravated assault and possession of a controlled substance. Wright pleaded true to these allegations, which made him a habitual offender. As a habitual offender, the range of punishment for the third-degree felony was increased. The minimum punishment was now 25 years and the maximum 99 years or life.

After hearing the evidence on punishment, the jury assessed 99 years. The trial court rendered judgment consistent with the jury's verdict, and we affirm.

Under existing law, our court reaches the only result it can in this case. Any ostensible error that arguably could have supported reversal was neither preserved below nor raised on appeal. Nonetheless, I cannot in good conscience silently affirm the severe and disproportionate punishment imposed by the jury in this case, which could only have resulted from evidence the jury should not have heard, because this kind of punishment undermines the legitimacy of our criminal-justice system.

**Discussion**

Simone Weil, a French philosopher, once observed that "everything connected with the penal law should wear a solemn and consecrated aspect," such that "the majesty of the law should make its presence felt by the court, the police, the accused, the guilty man—even when the case dealt with is of minor importance,

2

provided it entails a possible loss of liberty." SIMONE WEIL, THE NEED FOR ROOTS: PRELUDE TO A DECLARATION OF DUTIES TOWARDS MANKIND 21 (Arthur Wills trans., Routledge Classics 2002) (1949). Weil elaborated that punishments disproportionate to the crime are incompatible with genuine justice, and therefore beneath the majesty of the law, noting by way of illustration that a "scale of penalties which provides a much harsher punishment for ten acts of petty larceny than for one rape or certain types of murder" deprives a criminal-justice system of "anything that deserves the name of punishment." *Id.* When a punishment is unjust for this or other reasons, it is not truly punishment worthy of a criminal-justice system. *See id.* at 22 (arguing that genuine punishment only occurs when the hardship it visits on a wrongdoer is accompanied "by a feeling of justice"); *see also* Gordon Goodman, *The Ethics of Punishment*, IN CHAMBERS: THE OFFICIAL PUBLICATION OF THE TEXAS CENTER FOR THE JUDICIARY, Summer 2019, at 13–14 (discussing Weil's philosophical views on punishment).

Though Weil's articulation of these ideas may be unfamiliar to American lawyers and judges, the ideas themselves are not. It is a maxim of our criminal law that the punishment should fit the crime. *See Grunsfeld v. State*, 843 S.W.3d 521, 544 (Tex. Crim. App. 1992) (Clinton, J., concurring) (characterizing principle that "the punishment should fit the crime" as a "self-evident maxim"). By prescribing a range of punishment for crimes, rather than a fixed punishment applicable in all

cases, the Legislature has "made it the jury's job to assess the specific facts and circumstances of each case and determine where on the punishment scale the specific criminal act fits." *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).

Under our law, it is equally axiomatic that the punishment should fit the criminal. *See Grunsfeld*, 843 S.W.3d at 544 (Clinton, J., concurring) (observing "courts have traditionally believed that the punishment should fit the criminal as well"). One expression of this axiom is the habitual-offender statute, which provides that the range of punishment for a felony, other than a state jail felony, shall be life or a term of not more than 99 years or less than 25 years when a defendant has already been finally convicted of two other felonies. TEX. PENAL CODE § 12.42(d).

I have no quarrel with these general principles. But as this case illustrates, their application by juries in some cases can result in excessive punishment.

Like virtually any defendant who qualifies as a habitual offender, Wright is not a sympathetic defendant. The jury found Wright guilty of evading arrest in a motor vehicle and theft. He first led police on a high-speed chase. After abandoning the motor vehicle in which he had initially fled, Wright then stole a riding lawnmower in a continued but fruitless effort to escape from law-enforcement officers. During the punishment phase of trial, he pleaded true to the enhancement allegations that he had previously been convicted of two other felonies: an aggravated assault and possession of a controlled substance, methamphetamine.

4

Consequently, the minimum punishment Wright was eligible to receive with respect to the evasion offense was 25 years of imprisonment. *Id.*

The jury assessed Wright's punishment at 99 years. Given the evidence at trial, it is not necessarily surprising that the jury did not opt for the minimum. As his own trial counsel acknowledged at the outset of the punishment phase, the jury was "not going to hear anything good about" Wright during this phase of the trial.

Nevertheless, the jury's imposition of a sentence of 99 years stands out like a sore thumb. Neither of the two crimes the jury found Wright guilty of committing are crimes of violence. Of the two prior felonies that served as the basis for the enhancement allegations, only one was a violent crime, the aggravated assault. That conviction resulted from a prior episode in which Wright fled from the police in a motor vehicle and attempted to force a police vehicle off the road by ramming it. Dangerous as that conduct may be, it is less egregious than many violent crimes.

Other habitual offenders receive sentences far less severe under circumstances more egregious than the ones the jury confronted in this case. For example, in *Henry v. State*, a jury found the defendant guilty of the offense of evading arrest in a motor vehicle and using the vehicle as a deadly weapon. 509 S.W.3d 915, 916 (Tex. Crim. App. 2016). The jury also found the enhancement allegations regarding two prior violent felony convictions, one for aggravated assault and another for aggravated

robbery, to be true. *Id.* at 916–17. Even though the defendant was a habitual offender with convictions for violent crimes, the jury sentenced him to just 60 years. *Id.*

Similarly, in *Lomax v. State*, a jury found the defendant guilty of the offense of felony murder based on the death of a five-year-old girl, who died in an automobile accident the defendant caused by his drunken and reckless driving. 233 S.W.3d 302, 303 (Tex. Crim. App. 2007). Based on two unspecified prior felony convictions, the jury sentenced the defendant as a habitual offender. *Id.* Even though the defendant killed a small child, the jury sentenced him to just 55 years. *Id.*

In the same vein, in *Miller v. State*, a jury found the defendant guilty of three offenses: evading arrest in a motor vehicle, unlawful possession of a firearm, and unlawful possession of body armor. 605 S.W.3d 877, 880 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). The defendant led police on a high-speed chase in a vehicle he apparently stole at gunpoint. *Id.* at 880–81. It was unlawful for him to possess a firearm or body armor because he was a felon. *Id.* at 879. He pleaded true to the allegation that he was a habitual offender, and one of his prior felony convictions was for the assault of a family or household member. *Id.* at 880, 882. These facts notwithstanding, the jury sentenced him to just 30 years. *Id.* at 882.

I concede that no two criminal cases are exactly alike. Like unhappy families, each criminal case is unhappy in its own way. Punishment is necessarily a fact-bound determination, and the broad ranges of punishment in the Penal Code are intended

6

to allow juries to tailor the punishment to the circumstances of each case. *Sadler*, 977 S.W.2d at 142–43. But a criminal-justice system in which Wright receives approximately four decades more punishment than either of the defendants in *Henry* and *Lomax*, and almost seven decades more punishment than the defendant in *Miller*, is so arbitrary and capricious that it calls the system's credibility into doubt.

In general, our system presumes punishments for habitual offenders at or near the statutory maximum are reserved for situations in which the evidence shows the defendant is especially incorrigible, unusually dangerous, or both. *See, e.g.*, *Drichas v. State*, 175 S.W.3d 795, 796–97 (Tex. Crim. App. 2005) (jury found defendant guilty of evading arrest in a motor vehicle, which he used as a deadly weapon, and sentenced him to 99 years as a habitual offender with fourteen prior felony convictions); *Jones v. State*, 338 S.W.3d 725, 729–30 (Tex. App.—Houston [1st Dist.] 2011) (jury found defendant guilty of possession of a firearm by a felon and two drug-dealing offenses involving intent to deliver cocaine and ecstasy, and sentenced him to 99 years as a habitual offender with prior convictions for aggravated assault and arson), *aff'd*, 364 S.W.3d 854 (Tex. Crim. App. 2011).

While Wright is a habitual offender, and thus qualifies for a sentence somewhere between 25 years and 99 years or life, he hardly ranks among the worst. So, one must ask, why did the jury in this case throw the proverbial book at him?

The answer: during the punishment phase of trial, the jury heard two types of especially damning evidence it certainly should not have heard. Specifically, the jury heard conclusory testimony that Wright is a member of a violent white-supremacist criminal gang and testimony implicating him in the murder of his own sister.

Some standards that might otherwise restrict the admissibility of evidence are relaxed to a significant degree during the punishment phase of a criminal trial. In particular, character evidence and evidence of extraneous crimes and bad acts, regardless of whether they resulted in a charge or conviction, are admissible. TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1). The lone restriction safeguarding a trial from unreliable evidence of this sort is that the extraneous crimes or bad acts must be proved beyond a reasonable doubt. *Id.* In this case, the restriction was thwarted.

Let's begin with the murder. A. Lowrie, who was a lieutenant with the Polk County Sheriff's Department, testified about this extraneous crime. In 2013, a warrant was issued for Wright's arrest in connection with the alleged aggravated assault of Wright's girlfriend. Based on this warrant, Lowrie and other law-enforcement officers attempted to take Wright into custody. While testifying about their efforts to take him into custody and the vehicular pursuit that ensued when he tried to flee, Lowrie additionally testified, without objection, that Wright was also a "suspect in a homicide investigation" concerning the murder of his sister, who was shot twice in the head. This testimony was not inadvertent. Lowrie did not disclose

8

this information unsolicited. The prosecution intentionally introduced this evidence before the jury, asking Lowrie whether Wright was "also a suspect in a homicide investigation" after Lowrie had already testified about the unrelated warrant.

However, the prosecution did not offer any evidence connecting Wright to this murder beyond the bare indication of suspicion. Indeed, the prosecution made no attempt to prove a connection. On the contrary, during its closing argument, the prosecution conceded it had not connected Wright to the murder beyond a reasonable doubt. As such, this extraneous crime was categorically inadmissible. *See Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005) (holding article 37.07, § 3(a) requires jury to be "satisfied beyond a reasonable doubt that the acts are attributable to the defendant" before the acts can be considered for purposes of punishment).

Perhaps, in another situation, a belated acknowledgement by the prosecution that it had failed to prove an extraneous offense beyond a reasonable doubt might mitigate the harm. But the intentional injection of an unproved murder during the punishment phase in a trial for non-violent felonies places a skunk in the jury box that the jury cannot unsmell. *See Walker v. State*, 610 S.W.2d 481, 483–84 & n.6 (Tex. Crim. App. [Panel Op.] 1980) (reversing 99-year sentence in murder prosecution due to injection of inadmissible, inflammatory evidence of extraneous crime and noting that jury cannot be successfully instructed not to smell a skunk).

Then there is the gang evidence. Two witnesses testified about Wright's gang membership. Once again, the defense did not object to the testimony of either witness.

First, Deputy R. Martel of the Liberty County Sheriff's Office testified Wright is identified as a registered member of the Aryan Brotherhood in a state database called TX Gang. Martel described the Brotherhood as "a white pride, white national group that is really big in a lot of the prison systems" and that is involved in "a lot of violent crime and drug trafficking" outside of the prison systems. Common tattoos associated with Aryan Brotherhood membership include Nazi swastikas, SS emblems, and Hitler portraits. According to Martel, SS emblems in particular indicate "somebody that's really, really embedded into that kind of gang activity."

Video evidence admitted during the guilt–innocence phase of trial showed that Wright, who is heavily tattooed, has a large swastika tattoo on or around the left side of his torso. After eliciting the testimony about Aryan Brotherhood tattoos, the prosecution asked, "So if he has a large swastika on his rib cage that would be consistent with somebody in the Aryan Brotherhood?" Martel replied, "Yes, or any other of the—the white gangs." But the prosecution did not solicit any testimony from Martel explaining how he knew about the Aryan Brotherhood or its reputation for violent crime and drug trafficking. Nor did the prosecution elicit testimony about the reliability of the TX Gang database or Martel's level of familiarity with it.

10

Second, Deputy M. Dubose of the Liberty County Sheriff's Office testified that Wright is an active member of the Aryan Brotherhood. But once again, the prosecution did not solicit any testimony explaining how Dubose knew about gangs in general, the Aryan Brotherhood in particular, or Wright's membership.

It is well-understood that a defendant's active membership in a group known for criminal activity is virtually always a relevant consideration in deciding an appropriate punishment. *See Beham v. State*, 559 S.W.3d 474, 479 (Tex. Crim. App. 2018) (stating evidence a defendant is an active member of a gang that regularly engages in criminal activity "is almost always relevant for sentencing purposes"). Like any other testimony, however, facts about gangs, gang-related criminal activities, and one's active participation in these activities cannot be conclusory or speculative. *See id.* at 484 (stating prosecution "must make some showing of the group's violent or illegal activities" for membership to be relevant to sentencing). Nor is every law-enforcement officer competent to testify on these matters. *See id.* at 477 (noting that prosecution called "an experienced detective specializing in gang activity" to testify about gang crime and offer opinion based on photographs of defendant that he held himself out to the public as a member of some gang).

Here, the evidence about both the Aryan Brotherhood's activities and Wright's membership depended on the unsupported assertions of two witnesses who

11

were not shown to have any experience or personal knowledge on these subjects. Without this foundation, this evidence was not admissible. *See id.* at 477, 484.

Like the testimony that Wright was a suspect in his own sister's murder, the testimony that he was an active member of the Aryan Brotherhood was introduced for the purpose of establishing that he is the sort of especially incorrigible and unusually dangerous habitual offender whom the jury should punish severely. Presented with this evidence, the jury did just that, and it is hard to fault it for doing so. A member of a violent gang who poses a mortal threat to even his nearest kin is the sort of criminal who deserves a sentence at or near the statutory maximum.

The problem is that the jury should not have heard the evidence about the murder and gang. Under well-settled law, our criminal-justice system requires us to ignore this circumstance because these issues were neither preserved below nor raised on appeal. But doing so results in the affirmance of a severe and disproportionate punishment based not on actual proof of the defendant's penchant for extreme violence and unreformability but the mere suggestion of these characteristics. The affirmance of this kind of tainted verdict undermines the credibility of our criminal-justice system, credibility that it needs to serve the purposes for which it exists, and it diminishes the majesty of the law.

**Conclusion**

With these additional thoughts, I reluctantly join the court's opinion.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Hightower.

Justice Goodman, concurring.

Publish. TEX. R. APP. P. 47.2(b).